Submitted on briefs May 19; reversed and remanded July 13;
modified July 27, 1948

GABRIEL *v.* CORKUM ET AL.
OREGON MUTUAL SAVINGS BANK *v.*
GABRIEL and CORKUM ET AL.

196 P. (2d) 437

*Lenske, Spiegel & Spiegel,* of Portland, for appellants.

*B. G. Skulason,* of Portland, for respondents Gabriel.

*Davis, Herbring, DeMartini and Jensen,* of Portland, for respondent, Oregon Mutual Savings Bank.

BAILEY, J.

The appeals in two suits have been consolidated for presentation here. One of these suits was brought by William C. Gabriel against C. M. Corkum and Marion L. Corkum, co-partners doing business under the firm name and style of C. M. Corkum Co., to have declared null and void a notice of claim of a mechanic's lien, filed by defendants, on lots 5 and 6, and fractional lots 7 and 8, in block 38, Salem, Oregon, owned by plaintiff. Defendants filed an answer and counterclaim asking that the mechanic's lien be foreclosed. The second suit was instituted by Oregon Mutual Savings Bank, an Oregon corporation, against William C. Gabriel and Ruth M. Gabriel, his wife, and the Corkums, to foreclose a mortgage given by William C. Gabriel and wife to the Oregon Mutual Savings Bank, on the lots hereinbefore described, and to bar all the defendants from claiming any right, title or interest in or claim to or lien on said property. Defendants Corkum in their cross-complaint asked that the mechanic's lien filed by them be foreclosed.

A decree was entered in the first suit in favor of

Gabriel and against the Corkum Company declaring the notice of mechanic's lien filed by that company null and void. The decree in the second suit likewise declared the notice of mechanic's lien null and void, and further awarded the Oregon Mutual Savings Bank judgment against the defendants Gabriel for the amount found due it from them and ordered the mortgage given to secure the payment thereof foreclosed. From these two decrees defendants Corkum have appealed.

During the summer of 1945 Mr. Gabriel was contemplating the construction in Salem, on the lots hereinbefore described, of a combination food storage plant and grocery store. Plans and specifications therefor had been prepared by James W. De Young, an architect living in Portland, Oregon, and had been submitted to a number of contractors including the C. M. Corkum Company. On June 26, 1945, that company responded with the following letter, omitting the letterhead:

June 26, 1945

"Mr. William Gabriel
1095 N. Church Street
Salem, Oregon

Dear Sir:

"We appreciate the request from your architect to quote you on construction of a cold storage plant to be located at South Commercial Street between Bellevue and Oak Streets in your city in accordance with plans and specifications by J. W. De Young, Architect for the sum of Fifty-nine Thousand Nine Hundred and Eighty-Three and No/100 ($59,983.00).

"No rock excavation is included in quotation.

"Owing to the existing dislocated material market, we believe a considerable saving would result if the work be carried out on a cost plus and fixed fee basis. Lumber for example, we have only re-

tail quotations for, at an average price of $42.00 per M.B.F. Approximately 200 M.B.F. will be required in construction. Brick and tile as per quotation by Columbia Brick and Tile Company of Portland. Roofing, Sheet Metal and Painting by Salem firms. Excavation costs may be lowered if conditions as suggested by Mr. Eugene Wootten, our Construction Engineer, can be worked out. Some substitutes of material may be necessary in order to expedite construction work. In this case we would act as construction manager, handle payments of accounts, supervise buying and placing of material and general supervision for a fixed fee to be determined later. We shall be glad to discuss this with you.''

Very truly yours,

C. M. CORKUM COMPANY

By C. M. Corkum''

After receipt of that letter a conference was held between Gabriel, De Young and Corkum. Gabriel was then engaged in the wholesale lumber business and the opinion was expressed by all present that a saving might be effected if the building was constructed on a cost plus fixed fee basis. An oral agreement was thereupon entered into between Gabriel and the Corkum Company providing that the latter should build the structure on that basis.

During the trial it was contended by both Gabriel and De Young that the agreement between the Corkum Company and Gabriel was on a firm bid of $59,983, the amount stated in the first paragraph of the letter from the Corkum Company to Gabriel. In paragraph V of Gabriel's amended complaint it is alleged that on or about the 16th day of July, 1945, plaintiff orally accepted the bid mentioned in Corkum's letter of June 26, 1945, ''whereby the defendants undertook and agreed to erect said plant upon the terms set forth

in said bid for the sum of $59,983.00 therein mentioned; and whereby the said parties further agreed that the defendants should be paid the sum of $3,000.00 for the general supervision of said construction and the buying and placing of material therein." Gabriel testified that the $3,000 above referred to was included in the $59,983. At other times Gabriel and De Young testified that the work was to be done on a cost plus fixed fee basis but that in no event should the entire cost, including the contractor's fee, exceed $59,983.

█ That the contract was on a cost plus fixed fee basis, without any limit as to cost, and that Corkum Company was to receive $3,000 for its services, is established by the overwhelming weight of the evidence, and we find accordingly. C. M. Corkum testifed that such was the understanding. Two of the superintendents on the construction job testified that Gabriel told them several times that the work was being done on that basis. Three of the officers of the Oregon Mutual Savings Bank, from whom Gabriel borrowed $60,000 to finance the construction of the building, testified that Gabriel told them, when they were discussing with him the completion of the building by the Corkum Company, that the work was being done on a cost plus fixed fee basis, and that at no time did he tell them that there was any set limit as to the amount to be paid to the Corkum Company. In an undated memorandum written by Gabriel to C. M. Corkum subsequently to February 20, 1946, is the following statement: "In view of the fact that the Corkum Company is building the job for Mr. Gabriel on a cost plus fixed fee basis, it is to Mr. Gabriel's interest that the job be efficiently managed and operated." Mr. Gabriel was on the job practically all the time. De Young testified that he had appointed him as his agent to

supervise the construction work. All, or most of, the subcontracts were approved by Mr. Gabriel before they were let by the Corkum Company. Two supervisors were dismissed at his request, one of whom had been appointed on his suggestion. Periodic detailed statements were submitted by the contractor to Gabriel or to his architect showing disbursements made and obligations incurred by the contractor and the percentage of the $3,000 fee earned by it.

Work was started by the Corkum Company on or about July 16, 1945, and on September 13, 1945, it submitted to Gabriel a detailed statement of cost of material and labor furnished by the contractor, amounting to $9,591.41, to which was added one-fourth of its $3,000 fee, making a total of $10,341.41. The loan of $60,000 by the Oregon Mutual Savings Bank to Gabriel was not consummated until on or after September 25, 1945. On October 3, 1945, there was paid, to apply on that account, the sum of $10,000. Similar statements were submitted by the Corkum Company to Gabriel and to the architect on November 27 and December 31, 1945, January 31, February 28, March 31, April 30, and May 31, 1946. Nothing was paid on the January statement. The February statement showed the amount due the Corkum Company to be $44,868.26 on which had been paid $32,500. On March 10 there was paid $5,000 on that account. Shortly thereafter the architect insisted that he was entitled to retain 15% of the entire amount claimed by the contractor until the completion of the building. On April 17, 1946, $2,500 was paid on the March account, making an aggregate of $40,000 paid to the contractor. No further payments have been made. According to the April statement Gabriel owed the contractor $17,035.44, and according to the May statement he owed it $19,327.19.

Other work was performed by the contractor after May 31 amounting to approximately $3,000.

The claim of lien filed by the Corkum Company contains an itemized statement of labor and materials furnished, of disbursements made and of liabilities incurred by it in the construction of the building, and the amount of its fees, to wit, $3,000, aggregating a total of $62,245.24. The Corkum Company credits Gabriel with $40,000 paid and $500 to offset what Gabriel contended were unnecessary expenses incurred by the contractor. This leaves a balance of $21,745.24 due the Corkum Company.

Gabriel, in his reply to the Corkum Company's answer and counterclaim, alleges that the reasonable cost of completing the building according to plans and specifications is the sum of $13,570, and the evidence produced by him tends to support that allegation. Mr. Corkum testified that it would cost approximately $10,000 to complete the building.

The amount of the loan made by the Oregon Mutual Savings Bank to Gabriel to construct the building was the sum of $60,000, of which amount $821.25 was retained by the Bank for insurance premium and costs and charges of the loan, leaving available $59,178.75 to be used in payment for the construction of the building. Prior to May 20, 1946, there had been paid by the Bank to Gabriel $6,250 and to the Corkum Company $40,000, leaving undistributed from this loan $12,928.75, which amount would, according to the contention of Gabriel, be insufficient to pay for the completion of the building. If applied on the contractor's claim of $21,745.24, this balance would be insufficient by more than $8,800 to satisfy it.

De Young gave the following testimony relating

to the payment of statements submitted by the Corkum Company, the contractor:

"Q. Your specifications say you will withhold 15 per cent of the bills and statements of account submitted to you? A. It says we will pay up to 85 per cent.

"Q. 85 per cent of what? A. I don't know just how the specifications read. They are there. But it is usually on what the opinion—In this case, it is my opinion of what he has earned or what he is entitled to.

"Q. In other words, you felt under this arrangement you could set an arbitrary figure and say 85 per cent of that, and you could pay that figure? A. That is what I tried to do. I was protecting the owner; I had to protect the owner. There was no other protection, and I was protecting the mortgage company. In many of the cases, I went to the mortgage company and talked it over with them before I made the payments,—as to what he was entitled to. If this was a time and material job, this would not be this way. The bills would be submitted to me, and attached to it. Mr. Corkum has done work before for me, and he submitted the bills with his request.

\* \* \*

"Q. Then this was a cost plus job? A. No, it was not.

"Q. You held the money up until he paid the other men? A. No. \* \* \*

"Q. Is there $40,000.00 in the job, or $62,000.00? A. I paid him $40,000.00.

"Q. You figure that there is more than $40,-000.00 in the job, with the labor and material? A. Sure, with labor and material there is more than $40,000.00 in the job, but I was basing my payments on the percentage of work that was done, and I had to base it on some percentage, and I figured it on the basis of $60,000.00, and had that in my mind at all times, as to what the cost should be."

It is quite apparent that De Young considered that the Corkum Company was constructing the building on a firm bid contract and not on a cost plus fixed fee contract. During the latter part of the time the contractor was working on the building he, De Young, was "basing my payments on the percentage of work that was done". He stated, in the excerpt hereinbefore quoted, "If this was a time and material job, this would not be this way." In other words, under a cost plus fixed fee basis the payments would not be dependent upon "the percentage of work that was done", but on the total amount of labor and materials furnished.

■ On or about June 22, 1946, Gabriel went over the contractor's statements of account, exclusive of labor, with some of the officers of the Oregon Mutual Savings Bank, and at that time he claimed that such account was, exclusive of labor, excessive in the sum of $565.90. Among the items which he contended he should not be charged for were $106 paid as rental for a compressor, $124.20 paid as freight on plywood, and $175 which he claims as a credit for tile that had been returned to the materialman. Although the contractor testified that the objections made by Gabriel were without merit, nevertheless he gave him a credit in the claim of lien of $500 to offset these and other objections to the contractor's accounts made by Gabriel. Mr. Gabriel also contends that the superintendent and some of the workmen had been paid for time when they were not working. The amount of such overpayments, according to Mr. Gabriel, was $354.28. Both Mr. Corkum and his superintendent testified that no payments had been made except for actual work performed on the job. We are satisfied that the credit of $500 was more than sufficient to

cover any loss or damage suffered by Mr. Gabriel because of such alleged excessive charges for material and labor.

The Corkum Company, in paragraphs VII, VIII and IX of its counterclaim to Gabriel's complaint, alleges as follows:

"That plaintiff agreed with defendants that he would pay for the materials furnished and the labor performed upon said building at regular monthly intervals substantially in accord with the amounts expended or incurred, by the defendants on or towards said building.

"That plaintiff also agreed with defendants that whatever sums of money might become available by a loan and mortgage upon said property through the Oregon Mutual Savings Bank, an Oregon corporation, would be paid to defendants to apply upon the moneys payable to defendants for said labor and materials.

"That there has been available a sum approximating $10,000.00 in the hands of Oregon Mutual Savings Bank to apply upon the amount payable by plaintiff to defendants for said labor and materials, but the plaintiff has failed and refused to direct and permit the payment of said moneys to or for defendants."

Paragraph V of Gabriel's answer to the Corkum Company's counterclaim reads as follows:

"Answering paragraphs VII, VIII, and IX, the plaintiff alleges that it was agreed between him and the defendants that payments should be made to the defendants under the contract above mentioned at intervals upon the certificate of the plaintiff's architect from funds in the hands of the Oregon Mutual Savings Bank, an Oregon corporation, the same being the proceeds of a loan obtained by the plaintiff from said bank, and that at the time when the defendants abandoned said contract

as hereinafter pleaded there was in the hands of said bank a sum in excess of $10,000.00 of said proceeds. Except as above admitted the plaintiff denies each and every allegation contained in the last mentioned paragraphs.''

■ Gabriel filed the initial pleadings in this litigation. In his amended complaint, after setting forth that the Corkum Company had entered into an oral contract with him to construct a cold storage plant, he alleges that ''on or before the 21st day of June, 1946, the defendant (the Corkum Company) wilfully abandoned the further performance of said contract and failed and refused to complete the same and left said plant only partly constructed.'' This allegation was denied by the Corkum Company. Under the issues thus raised it was permissible for the Corkum Company to show any fact tending to excuse it from the completion of the building. One of the reasons alleged by the Corkum Company for not completing the building, and concerning which evidence was introduced, was the failure of Gabriel to pay the contractor for materials furnished and labor performed as agreed.

■ The admissions in paragraph V of Gabriel's answer and the construction placed on the contract by the payments made by Gabriel to the contractor, as hereinbefore set forth, considered with other evidence in the record, convinces us that the allegations in paragraphs VII, VIII, and IX of the Corkum Company's counterclaim are established.

■ It is stated in Boisot on Mechanics' Liens, § 82, p. 88, as follows: ''The owner's refusal to pay an installment of the contract price when due is such a violation of the contract on his part as will justify the contractor in refusing to go on with the contract.'' We find in 40 C. J., Mechanics' Liens, § 152, p. 138,

the following: "It is generally held that the owner's refusal to pay an installment due under the contract is a justification of the contractor's refusal to complete his contract, and entitles him to enforce a lien for what has been done; * * *." See in support of the foregoing rule the following: *Hunter v. Walter,* 128 N.Y. 668, 29 N.E. 145; *Thomas v. Stewart,* 132 N.Y. 580, 30 N.E. 577; *Carew v. Stubbs,* 155 Mass. 549, 30 N.E. 219; *Dybvig v. Willis,* 59 Idaho 160, 82 P. (2d) 95; see also Phillips on Mechanics' Liens, 3rd Ed., § 138, p. 244; *Justice v. Elwert,* 28 Or. 460, 43 P. 649.

■ The default on the part of Gabriel to pay the contractor for labor and material furnished as agreed justified the Corkum Company in refusing to proceed with the contract. The cessation of work on the building was attributable to the fault of the owner in failing to pay the contractor as agreed. Under the circumstances the Corkum Company is entitled to a lien even if it did not substantially complete the building. See cases and texts cited in preceding paragraph; also *Bradfield v. Bollier,* 169 Or. 425, 128 P. (2d) 942. In *Dybvig v. Willis,* supra, where a similar question was involved, the court said:

"Bearing in mind that our lien statute protects a contractor for all labor performed and materials furnished in either constructing or reconstructing a building, and that such statute must be liberally construed with the object in view of promoting justice, can the owner of a building reconstructed by a contractor deprive him of the protection of the statute by breaching the contract under which the labor was performed and materials furnished? To deny the contractor protection under such circumstances would be most unjust and would defeat the clear purpose and intent of the statute. Moreover, it would permit the owner to take advantage of, and profit by, his own wrong."

The next question to consider is the amount of the lien. Gabriel contends that the contractor deviated from the plans in two particulars, to wit: (1) By constructing a portion of the roof with 2″ x 8″ rafters instead of 2″ x 10″ rafters; (2) by not constructing one of the exterior driveways according to plans and specifications.

It was understood that Gabriel was to purchase all the lumber used on the job. During the autumn of 1945 the basement was flooded with rain water due to the absence of a roof on part of the building, and it was necessary to pump the water therefrom. The plans and specifications called for 2″ x 10″ rafters, which could not be procured, and what was considered as a temporary roof was built with 2″ x 8″ rafters. Mr. Wooten, who was superintendent at the time this work was done, gave the following testimony:

"Q. Now with respect to the roof. Give the court the facts on that. A. Well, the basement was flooded; water was coming in. And I suggested that we put the roof on temporarily, with the intention of later on inserting 2x10s between the 2x8s, which were put in there temporarily in order to get the roof on and in order to get the basement and the lower part of the building dry.

"Q. What were the conditions existing at that time, and when was that? A. It was very wet at that time.

"Q. Was that in the fall of 1945? A. I don't remember now, but it was before I left.

"Q. Did you discuss that with Mr. Gabriel? A. Yes, I did. And at that time Mr. Gabriel said he couldn't get any 2x10s. And I suggested that we use the 2x8s and put a bolt on each side of the present beam that is in there and add another 2x10 or 2x12 and let the joists sit on that.

"Q. Did you ever contend that the present status was the final status? A. No. That was not; that was not final.

"Q. At about the time that this roof was put on, what was the condition with reference to the pumping of water? A. There was a lot of water coming in there. At times it required two pumps to keep the water out. There was two pumps kept there for quite a time,—I don't remember just how long, but it took two pumps to keep the water out."

On cross-examination he gave the following testimony:

"Q. Didn't you inquire, before you started to put that roof on, whether there were any 2 x 10s? A. Yes. Before we put the roof on I checked it up with Mr. Gabriel, and tried to get the 2 by 10s here.

"Q. What did he say? A. He said he couldn't buy any."

Mr. Gabriel was, as we have hereinbefore stated, on the job practically all the time. Moreover, De Young testified that he had designated Gabriel as his agent to supervise the construction of the building. Neither Gabriel nor his architect objected concerning this part of the construction of the roof until long after it had been built. It is our opinion that at the time this roof was built 2″ x 10″ rafters could not be procured; that the building of the roof could no longer be delayed; and that Gabriel gave his consent that it might be constructed as it was, to be later reinforced by larger rafters.

The driveway in dispute connected the rear of the building with the alley. It was 20′ x 30′ in area. At the time the plans were drawn the level of the alley had not yet been established. Before beginning construction thereof Mr. Wooten consulted J. H. Davis,

city engineer, and procured from him the proposed permanent level of the alley. Had it been built according to Gabriel's contention the level of the alley would have been two feet higher than the surface of the driveway. In this connection Mr. Gabriel gave the following testimony:

"Q. One more question regarding the driveway: You contend that the driveway should have been built according to the plans, don't you? A. Yes, sir, I do.

"Q. And if it were built according to the plans you would have been satisfied, is that right? A. I would have had to be.

"Q. Did the plans call for the driveway to be lower or higher than it was built? A. The entrance way was to be lower.

"Q. Now, if the entrance way was lower, what effect would that have with respect to the alleyway, in relation to the driveway. A. The effect it would have, in respect to the alleyway level as it is now, would be that the entrance way at the point of the lot there would be below the level of the present alley level.

"Q. How far below? A. Roughly estimating, I would say a couple of feet.

"Q. In other words, based upon the way the alleyway is now, if it were built according to the plans and specifications, there would be about a 24 inch drop from the alley way down to the very commencement of the driveway; is that right? A. That is right."

■ The driveway was actually constructed so that the surface thereof would be on the same level as the proposed permanent surface of the alley with which it connected. At no time has the architect, since ascertaining the proposed permanent level of the alley, given any other or different instructions as to how this

driveway could or should be constructed. There is no evidence that Gabriel or the architect objected to the manner in which the driveway was being, or was, constructed until after the contractor ceased work on the project. On the authority of *Pippy v. Winslow,* 62 Or. 219, 125 P. 298, Gabriel is estopped from claiming that the roof and driveway were not constructed according to plans and specifications.

In our opinion the lien filed by the contractor is a valid and subsisting lien for the entire amount specified therein, to wit, $21,745.24. C. M. Corkum and Marion L. Corkum, co-partners doing business under the firm name and style of C. M. Corkum Company, are entitled to judgment against William C. Gabriel for the amount of the lien, together with interest thereon at the rate of 6 per cent per annum from August 13, 1946, for the further sum of $2,000 which we adjudge to be a reasonable amount as attorneys' fees, and for their costs and disbursements herein, and for a decree in each suit foreclosing said lien.

It is therefore ordered that the decrees appealed from be reversed and the causes remanded to the Circuit Court for further proceedings not inconsistent herewith.

ON PETITION FOR MODIFICATION.

ALLOWED.

BAILEY, J.

The Oregon Mutual Savings Bank, an Oregon Corporation, and one of the respondents above named, has filed a petition for a modification of the court's opinion so as to conform to the notice of appeal given by C. M. Corkum and Marion L. Corkum, co-partners doing business under the firm name and style of C. M.

Corkum Co., in the case of *Oregon Mutual Savings Bank, an Oregon Corporation, v. William C. Gabriel, et al.*

The petition is granted and the last paragraph of the opinion reading as follows:

"It is therefore ordered that the decrees appealed from be reversed and the causes remanded to the Circuit Court for further proceedings not inconsistent herewith."

is deleted and there is added in lieu thereof the following:

"It is therefore ordered that the decree in William C. Gabriel v. C. M. Corkum, et al., be reversed and set aside, and that the decree in Oregon Mutual Savings Bank, an Oregon Corporation, v. William C. Gabriel, et al., be set aside so far as it affects the rights of the appellants C. M. Corkum and Marion L. Corkum, co-partners doing business under the firm name and style of C. M. Corkum Co., and that appellants be granted the relief prayed for in the prayer of their answer and cross-complaint in said suit, and that the causes be remanded to the Circuit Court for further proceedings not inconsistent herewith. Nothing herein stated shall be considered as affecting the judgment and decree in favor of the Oregon Mutual Savings Bank, an Oregon corporation, against defendants William C. Gabriel and Ruth M. Gabriel, his wife, and Foster and Kleiser Company."

BRAND, J., did not participate in this opinion.