MARGARET C. COTTRELL, as Administratrix of the Estate of MURRY COTTRELL, Deceased, Plaintiff and Respondent, v. ERVIN WEINHEIMER, Defendant and Appellant.

No. 9978.
Submitted March 4, 1960. Decided April 18, 1960.
Rehearing denied May 19, 1960.
351 Pac. (2d) 543.

Leo C. Graybill, Great Falls, for appellant.

J. E. McKenna and Donald E. Ronish, Lewistown, for respondent.

MR. CHIEF JUSTICE HARRISON delivered the Opinion of the Court.

Appeal from judgment entered upon a jury verdict in favor of the plaintiff in an action to recover payment for the drilling of a water well.

Murry Cottrell, the original plaintiff, from about 1947 fol-

lowed the occupation of a well driller. Following the filing of this action and on August 3, 1955, he died and his wife as administratrix of his estate was substituted as plaintiff herein. The complaint in this cause was filed on October 5, 1950, and the trial commenced on January 23, 1958. Plaintiff's widow. having remarried and being now Margaret E. Keegan, testified as to certain preliminary conversations at which she was present between the defendant and her deceased husband concerning the drilling of the well in question and on April 2, 1950, defendant wrote Cottrell a letter whcih reads:

"I hired Mr. Singley to come out last Fall and drill a 200' well for me. After he got down 150' he cased the well with 6¼" 1 D. Casing and cased off that bad water I had talked to you about. He then drilled another 50' but didn't get the water I was told we would get, so I put a plug in the top of the casing and left the well set.

"I asked Mr. Singley how much farther he thought I would have to drill to get a flowing well, he said he figured about another 800'. I got Judge DeKalb to come out and look the setup over and he said he figured the water we picked up at the surface was the (I think) Mowry beds, and if that was so we would hit the base sand at a 1000' from the ground level with a possibility of getting water that would be good in the Big Muddy which we should hit at approximately 365'.

"I have decided to drill down to water as soon as I can get some one to start drilling and was wondering if you would be interested in the job, if you would be, would you please let me know, as I would like to have some one start drilling right away if possible.

"I thought of putting down 4" casing the rest of the way or some size near that if a person could get it."

Thereafter defendant wrote Cottrell another letter on April 20, 1950, which stated:

"We have decided to wait and have you drill our well

for us, although if it is possible for you to get here before the first of July, I would appreciate it very much.

"Would you let me know whenever you are sure of when you can get here;

"If you get this letter would you please let me know, I forgot to ask you if you had a box in Geraldine, so, I am not sure whether you will get this."

According to Mrs. Keegan on July 27, 1950, she, Murry Cottrell and defendant met at defendant's ranch and a contract was made to drill from the bottom of the 200 foot well then existing on the defendant's place. The consideration to be paid by defendant to Cottrell for such drilling was to be for the first 500 feet beyond the 200 feet, $2 a foot, and for the next 700 feet, $2.50 a foot, with the understanding Cottrell was to draw money from his drilling whenever he needed or wanted it.

She further testified that Cottrell moved on the Weinheimer place on August 14, 1950, commenced drilling on August 16, reached a depth of 1,400 feet on August 30, and at that time Weinheimer paid to Cottrell the sum of $500. At the request of Weinheimer, Cottrell agreed to go deeper and below 1,400 feet, and the rate was to be $3 per foot. There was no stipulation as to depth, only to try and reach water. The drilling continued to 1,725 feet which was reached on September 1, 1950, at which time Cottrell twisted off 180 feet of drill stem and the drilling bit. A fishing tool was ordered and received on September 22 and the drill stem and bit were removed from the hole on September 28. Cottrell then demanded from Weinheimer his money for the 1,525 feet of drilling and Cottrell told Weinheimer that if he paid him he would continue to drill, try to get to 1,800 feet. Weinheimer replied that he would not pay until Cottrell drilled further, but Cottrell stated he would not drill any more until he was paid. Cottrell then sued Weinheimer and complaint in this action was filed on October 5, 1950. Cottrell left his drilling rig on the well for twenty-one days and

Mrs. Keegan further testified that the average profit they expected to make when they operated the rig was $80 per day.

Weinheimer testified that the terms of the contract were $2 from 200 feet to 700 feet; $2.50 from 700 feet to 1,400 feet; $3 from 1,400 feet to 1,800 feet; and from 1,800 feet to 2,200 feet he believed the rate was $3.50; that upon completion of the hole, Cottrell would be paid in full, and that there was no provision for drawing before the completion of the well. Following the demand by Cottrell for payment Weinheimer testified he told him the agreement was to drill to 1,800 feet and he was not to pay him anything until the well was completed. Mrs. Weinheimer testified to the same effect except that she made no mention of the rate beyond 1,800 feet, but stated there was conversation that Cottrell could go to 2,200 feet.

It will be seen that the difference between the versions of the contract as testified to by the parties is that plaintiff maintained that a second agreement was made after the depth of 1,400 feet had been reached, whereas defendant contends that the original agreement covered drilling to 2,200 feet.

Mrs. Keegan testified she had assisted her husband on the drilling rig and was experienced as a well driller. It appears in the evidence that Cottrell's rig was rated to drill to a depth of 1,500 feet but on two occasions it had gone to 1,725 feet and once to 1,735 feet. Mrs. Keegan testified that in the preliminary conversations in 1949 between Cottrell and Weinheimer, Cottrell had stated to Weinheimer that he doubted he could get water and had refused to drill. It is to be noted that Weinheimer in his letter to Cottrell of April 2, 1950, mentions no greater depth than 1,000 feet, while in his testimony he stated rates were agreed on before commencement of drilling to a depth of 2,200 feet.

The jury found a verdict for the plaintiff for the full amount claimed.

Defendant specifies error in five general particulars, being that the plaintiff was not entitled to recover for shutdown time;

that the court erred in giving certain instructions, the effect of which defendant asserts made the contract divisible; that the court erred in refusing to give a defendant's proposed instruction, the effect of which was to hold that the contracts should be considered together; that the court erred in permitting certain testimony to be given over defendant's objection; and finally that the evidence was insufficient to justify the verdict.

In his complaint, Cottrell alleged that the equipment was shut down because defendant had neglected and refused to pay for the drilling already performed; that it was of the reasonable value of $80 per day, and prayed for the sum of $80 per day for each day the equipment was shut down and not in use. Mrs. Keegan testified as to a period of twenty-one days, which would cover the period from the filing of the complaint on October 5 to the date the rig was moved off on October 27. It appears that the equipment was left at the well site at the request of Cottrell's attorney and Cottrell contends that he had to leave the equipment at the well site and hold himself ready and willing to proceed if defendant made payment. Cottrell made demand for payment and it was refused and he filed this action as a result thereof. There is testimony in the record that Cottrell was otherwise engaged during some part of the period he left the equipment sitting at the Weinheimer well and also that he had another drilling job to which he could go.

Without going into detail as to the principles covering the measure of damages for loss of profits, it is apparent on the record before us that the reason Cottrell left his equipment at the well site was personal with him, i. e., so he would be able to go ahead if defendant paid his bill. When Cottrell informed defendant he would not drill further without payment and defendant refused payment unless Cottrell drilled further, the contract was at an end and Cottrell so treated the matter when he instituted this suit. It certainly was never in the contemplation of the parties that merely by leaving the drilling rig idle at the well that the damages could be enhanced. There

was no reason why the rig could not have been moved the day the suit was commenced rather than twenty-one days later. There is no proof that defendant prevented removal of the equipment or did anything other than refuse to pay. Cottrell was free to remove his equipment and use reasonable effort to secure other work for it and without proof of such effort the position of Cottrell is untenable as to the shutdown time.

As to the second point raised by defendant, being that the contract was entire and indivisible and that the court erred in instructing the jury in its Instruction No. 14 that:

"You are instructed that when, under a contract, a payment becomes due but the party liable therefor refuses to make it, the party entitled to receive it has a right to abandon further work and sue for that already done."

The court also instructed the jury by its instruction No. 16:

"You are instructed that if you find, by a preponderance of the evidence, that the original agreement between Murry Cottrell and Ervin Weinheimer was full performed by one of the parties after which another agreement was entered into, then each of said agreements is separate and distinct from the other and recovery under one is not dependent on the other."

Plaintiff's proof was to the effect that there were two agreements with regard to the drilling of the one well and the court did not err in so instructing the jury.

In Gabriel v. Corkum, 183 Or. 679, 196 P.2d 437, 442, the court said:

"It is stated in Boisot on Mechanics' Liens, § 82, p. 88, as follows: 'The owner's refusal to pay an installment of the contract price when due is such a violation of the contract on his part as will justify the contractor in refusing to go on with the contract.' We find in 40 C. J., Mechanics' Liens, § 152, p. 138, the following: 'It is generally held that the owner's refusal to pay an installment due under the contract is a justification of the contractor's refusal to

complete his contract, and entitles him to enforce a lien for what has been done * * *.' [Citing cases.]''

In McAfee v. Bankers Trust Co., 253 Mich. 685, 235 N.W. 807, 809, that court said:

"The contract in question has all the essentials of a divisible contract. It sets off portions of the price against portions of the performance and requires immediate payment on each portion when performed, 'so that when part of the performance has been rendered a debt for that part immediately arises.' According to the contract a portion of the performance was furnishing and delivering steel casing at the well by the Gray corporation. Set off against this was $2,000, a portion of the total price made due and payable immediately. When the steel was delivered, the Gray corporation could have enforced payment of the $2,000 without waiting for the completion of the contract or without further performing any other portion thereof.''

To the same effect see Bailey v. Fredonia Gas Co., 82 Kan. 746, 109 P. 411, 413, wherein that court. quoting from Canal Company v. Gordon, 73 U.S. 561, 18 L.Ed. 894, stated:

'' 'In a contract to make and complete a structure, with agreements for monthly payments, a failure to make a payment at the time specified is a breach which justifies the abandonment of the work, and entitles the contractor to recover a reasonable compensation for the work actually performed. And this notwithstanding a clause in the contract providing for the rate of interest which the deferred payment shall bear in case of failure.' * * *

'' 'Where work is done under a contract which provides for payment by installments at stated periods, and the payments are not made, the contractor may quit the work, and he will then be entitled to recover for all that he has done at the contract rates; and this notwithstanding the contract provides in express terms that the work shall be steadily

prosecuted without intermission to final completion.' Syllabus, Bean v. Miller, 69 Mo. 384.''

With regard to the third point, that the contracts were to be taken together and that the court erred in not giving defendant's proposed instruction No. 10, which was in the words of section 13-708, R.C.M. 1947, what we have said with reference to the second point disposes of this contention since we hold that the agreements under the circumstances shown here were divisible.

■ Under his fourth point the defendant contends that the court was in error in permitting Mrs. Keegan to testify as to the making of the second contract. Her testimony on direct examination on this point is as follows:

"Q. Alright, after you reached that 1,400 foot level, was there conversations about going deeper? A. Yes, it was by request of Mr. Weinheimer that we went deeper.

"Q. That you go beyond the 1,400 foot level? A. Yes.

"Q. At that time, were there more negotiations as to the pay scale? A. Below that, below the 1,400 foot would be $3.00 a foot.

"Q. Was there anything agreed upon as to how deep that well would go beyond the 1,400 foot? A. No.

"Q. Was there anything said as to how far Mr. Cottrell could go with his rig?

"Mr. Graybill: To which we object on the grounds it is leading; I have been passing these objections up. * * *

"The Court: Very well, the objection is sustained here. I don't think it is material.

"Mr. Ronish: What was the understanding after the 1,400 foot level?

"Mr. Graybill: To which we object on the grounds again — no proper foundation laid, it's *hearsay* and self-serving declarations.

"The Court: Objection is overruled, you may proceed.

"Mr. Ronish: Go ahead and answer.

"Witness: Well, there was no understanding only that we would drill on. * * *

"Q. At $3.00 a foot? A. At $3.00 a foot."

On cross-examination this testimony appears:

"Q. You stated there was another contract made, I believe when you were down to 1,600 feet after having drilled 1,400, is that when you said the next contract was made? A. At 1,380.

"Q. 1,380? A. Sure.

,"Q. Now does that mean you had drilled 1,380 feet? A. No.

"Q. That means you were down to 1,380 feet? A. Yes.

"Q. Who was present at that time? A. I couldn't tell you that.

"Q. You weren't there? A. No."

Thereafter defendant moved to strike certain portions of Mrs. Keegan's testimony with regard to the first contract as to which she had testified, which motions were denied. No reference was made to the so-called second contract in any of the motions to strike.

It is difficult from the above-quoted testimony of Mrs. Keegan on cross-examination to determine whether she had clearly in mind what counsel adopts as his version of the testimony, that she was not present when the second contract was made. It is noticeable that counsel conducted no further questioning along this line nor made any motion when this testimony was developed so that the court might be advised of his interpretation of her testimony. At the time counsel made his objection on direct examination it was properly overruled and since thereafter the matter was not called to the attention of the court by appropriate objection or motion, we fail to perceive how any erroneous action can be charged by the court.

■■ Defendant's fifth and last point maintains that the evidence is insufficient to justify the verdict. Defendant's contention here is based upon the argument that Mrs. Keegan

contradicted herself or was contradicted by other evidence. The credibility of witnesses is generally a matter for determination by the jury under proper instructions from the court. While in this cause there were inconsistencies and contradictions in her testimony it is likewise true that the cause of action arose in 1950 and the case was tried in 1958, and anyone's recollection on immaterial or collateral matters could easily become dim in the interim. In our view there was sufficient credible evidence to justify the verdict.

The cause is remanded to the district court with instructions to modify and amend its judgment so as to eliminate therefrom the sum of $840 awarded by the jury for shutdown time, and as so modified and amended the judgment of the district court will be affirmed. Defendant to recover one-fourth of his costs on this appeal.

MR. JUSTICES ADAIR, ANGSTMAN, CASTLES, and THE HONORABLE SID G. STEWART, District Judge sitting in place of MR. JUSTICE BOTTOMLY concur.