Argued March 11, affirmed July 11, 1977

RALPH ALLEN, INC., *Respondent,*
*v.*
MARGARET LUMPKIN et al, *Appellants.*
(No. 29262, SC 24515)
566 P2d 872

Jack L. Joyce, Philomath, argued the cause and filed a brief for appellants.

John S. Horton of Weatherford, Thompson, Horton & Jordan, Albany, argued the cause and filed a brief for respondent.

Before Denecke,* Chief Justice, and Tongue, Bryson, and Davis, Justices.

BRYSON, J.

---

*Denecke, Chief Justice, did not participate in the decision of this case.

**BRYSON, J.**

Plaintiff (Allen), building contractor, brought this suit to foreclose its mechanic's lien on defendants'[1] improved real property. Defendants filed a general denial and six affirmative answers and counterclaims. Only the last three of these are relevant to this appeal. In their fourth, fifth, and sixth counterclaims, defendants allege that the lien included nonlienable items, that the lien notice included items not chargeable under the contract, and deviations from specifications and the building plans. Defendants' third counterclaim constituted a legal counterclaim for breach of contract which defendants elected, at the close of plaintiff's case, to try at law by jury.

■ The trial court entered judgment against the defendants and decreed that plaintiff's mechanic's lien be foreclosed. The trial court made the following specific findings pertinent to this appeal:

"1. At the close of the Plaintiff's case in chief, the Defendants Lumpkin and Taubman elected to have the legal breach of contract issue tried on the law side of the Court.

"2. The evidence supports a finding that the Plaintiff has established a prima facia [sic] case.

"* * * * *.

"6. The evidence does not support a finding of a breach of contract such as would invalidate the lien.

"7. The lien notice did not include items not chargeable under the contract except the compressor for the heating system. The inclusion of the compressor was in good faith without culpable negligence. The compressor can not be segregated by looking at the face of the lien. It can be segregated by segrating [sic] the whole of the separate Hendrix lien of $6,902.10 which specifically includes the compressor at $1,988. The entire items in

---

[1] Also named as defendants are First National Bank of Oregon, which provided construction financing secured by a mortgage, decreed by the court to be superior to that of plaintiff's lien and three other lienors. None of these defendants appeal from the trial court's decision, and the term "defendants" is used to refer only to defendants Lumpkin and Taubman.

Hendrix lien of $6,902.10 are segregated from the Plaintiff's lien.

"* * * * *."

Defendants appeal, and we review de novo.

Defendants admit that the parties entered into a written contract[2] on October 5, 1973, as alleged in plaintiff's complaint. The contract covered the "[r]emodeling and rebuilding of existing residence as per plans and specifications in 12 sheets as prepared by D. Lu Reynolds, Architect * * *," located in Benton County.

Difficulties immediately occurred because 50 percent of the construction involved remodeling of an old house. Subcontractors refused to give estimates or firm bids on major work. The architect that supplied the plans and blueprints was not a "full-service" architect, meaning she did not superintend the construction and knew she would be gone for several months and would not be available for consultation if problems arose. The architect stated she could not get into the premises or examine the same prior to preparing the plans. She testified:

"Q  Well, if you try to doesn't that mean that you have to examine the premises very thoroughly to see what condition they are in?

"A  Well, that should have been done, but I don't know if it was.

"* * * * *.

"A  I was unable to get into the house except once because of the little lady who happened to live there.

"Q  Your plans were all drawn then for remodeling and partially new construction?

"A  The best that I could do.

"Q  Upon one visit to the house?

"A  No, I was there on other times, but I couldn't get into the house.

"* * * * *.

---

[2]The contract was "The American Institute of Architects Standard Form of Agreement Between Owner and Contractor where the basis of payment is the COST OF THE WORK PLUS A FEE."

[ 74 ]

"A    I had gone under the house from the old garage, crawled under with a flashlight and examined what would have been the old kitchen area and so on as near as I could see."

The plans called for over 3,500 square footage of new and remodeled construction.

The defendants secured a building loan from First National Bank of Oregon, and plaintiff was required to submit statements covering material and work completed to the bank, supported by an affidavit, of their construction.

Construction work started October 29, 1973, and ceased June 15, 1974. When defendants refused to approve or authorize the bank to make payment to the plaintiff for three months, plaintiff discontinued the construction when it was unable to advance funds for further labor and materials.

Paragraph 7.3 of the contract provides:
"The Contractor shall be paid ninety per cent (90%) of the proportionate amount of his Fee with each progress payment, and the balance of his Fee shall be paid at the time of final payment."

The plaintiff filed its lien in the amount of $70,820.38, the balance due after allowing credits and payments made.

Article 7 of the contract provides:
"In consideration of the performance of the Contract [and the changes in the work], the Owner agrees to pay the Contractor in current funds as compensation for his services a Contractor's Fee as follows:
"10 PERCENT OF THE COST OF THE WORK."

Article 9 of the contract provides:
"9.1    The term Cost of the Work shall mean costs necessarily incurred in the proper performance of the Work and paid by the Contractor. Such costs shall be at rates not higher than the standard paid in the locality of

the Work except with prior consent of the Owner, and shall include * * *"

wages paid for labor employed by the contractor in the performance of the work, including welfare or other benefits, taxes for such items as unemployment compensation and social security.

Paragraph 9.1.5 also provides payment to plaintiff for "[c]ost of all materials, supplies and equipment incorporated in the Work, including costs of transportation thereof."

Paragraph 9.1.6 provides:

"Payments made by the Contractor to Subcontractors for Work performed pursuant to subcontracts under this Agreement."

Paragraph 9.1.16 provides:

"Other costs incurred in the performance of the Work if and to the extent approved in advance in writing by the Owner."

Article 6 provides:

"6.1 The Owner agrees to reimburse the Contractor for the Cost of the Work as defined in Article 9. Such reimbursement shall be in addition to the Contractor's Fee stipulated in Article 7."

Paragraph 6.2, providing for a "maximum cost to the Owner," was specifically deleted from the form contract.

Mr. Nordyke, a contractor, was engaged by defendants to complete the structure. He testified the house was "two-thirds to three-fourths" completed when he came on the job. His charges to defendants were $21,000. He secured bids and submitted them to defendant Lumpkin for decision. He testified he only "coordinated" the work. For his employees' labor he charged $12 per hour, which is in excess of that paid by plaintiff to its employees for like work.

The defendants' first assignment of error contends "[t]he court erred in finding that there was no breach of contract such as would invalidate the lien."

Defendants first argue that the plaintiff breached its fiduciary relationship with the owner. Article 4 of the contract, which defendants rely upon, provides:

"The Contractor accepts the relationship of trust and confidence established between him and the Owner by this Agreement. He covenants with the Owner to furnish his best skill and judgment and to cooperate with the Architect in furthering the interests of the Owner. He agrees to furnish efficient business administration and superintendence and to use his best efforts to furnish at all times an adequate supply of workmen and materials, and to perform the Work in the best and soundest way and in the most expeditious and economical manner consistent with the interests of the Owner."

The trial court was confronted not only with conflicting evidence on this issue, but also with the fact that there was no architect present with whom the plaintiff could cooperate or consult. The evidence shows that the financing bank recommended the plaintiff to defendants and their architect based on its previous performance. At least two other contractors had been contacted by defendants prior to their contracting with the plaintiff. We conclude from the evidence that plaintiff Allen did furnish his best skills and judgment and that there was no breach of contract such as would invalidate the lien. This was a "remodel job" and it was fraught with unexpected obstacles and unexpected conditions from the time it was started. The defendants' architect testified as follows:

"Q  Now, this was a remodel job, wasn't it, when you're talking about that?

"A  Half of it was, yes.

"Q  And don't you run into difficulties in remodeling an old place in the sense that you don't know what you're going to run into in the way of the condition of the old structure?

"A  Yes. Much of it you, though, can ascertain, but you have to get down and crawl and get up and crawl, I guess.

"Q  And in your designing on this, you cannot take into account all the things that one might run into in remodeling as to what would be required for taking out

some of the materials that may be rotted or that may be leaking or something of that nature?

"A   Uh-huh."

However, the architect also testified that plaintiff's "workmanship was good."

The defendants also argue that plaintiff did not obtain bids for the subcontract work and thereby breached Article 12 of the contract, which provides:

"12.1   All portions of the Work that the Contractor's organization has not been accustomed to perform shall be performed under subcontracts. The Contractor shall request bids from subcontractors and shall deliver such bids to the Architect. The Architect will then determine, with the advice of the Contractor and subject to the approval of the Owner, which bids will be accepted.

"* * * * *"

As stated, the architect testified that she was not a "full-service" architect on this job and that she only prepared the plans and specifications and would not be present for consultation for some three months. In this connection, the architect testified that before she left on her trip "Mr. Allen [plaintiff] said that he had his own subcontractors that he liked to do business with" and that she wouldn't suggest subcontractors because she didn't know any in the Corvallis area.

The plaintiff contends that that portion of Article 12 calling for subcontractor bids to the architect was waived because it was known by the defendants that the architect would not be available. Plaintiff also contends that that portion of Article 12 requiring bids from all subcontractors was waived by agreement of the parties when plaintiff advised the defendants that subcontractor bids could not be obtained and defendants authorized plaintiff to proceed without securing firm bids. He testified that he contacted numerous subcontractors within the community for electrical, plumbing, heating and other work but because it was a "remodel job" they were unwilling to give a firm bid and would only do "the work on the basis of cost plus, cost plus a fee or cost plus a percentage or time and

materials" and that he reported this to defendant Lumpkin, who transacted all business on behalf of the defendants. He testified:

"Q What did Mrs. Lumpkin say in relation to these reports of yours to her?

"A Miss Lumpkin's response at the various times that I reported to her was that if that's the best that we can do, then go ahead and contract with the firm that would—I felt would do us the best job on the basis that we could get them, which was a cost plus basis."

Plaintiff then proceeded with competent subcontractors.

Defendant Lumpkin denies this testimony and testified that plaintiff Allen did not tell her he was having difficulting getting subcontractor bids on any basis other than cost plus and that she did not tell him to proceed to obtain subcontractors on a cost plus basis.

However, Mr. Nordyke, who completed the work for defendants, testified as follows:

"Q And there's a difference, isn't there, in getting bids on remodeling?

"A Yes, sir.

"Q And do you find it difficult sometimes in getting bids on remodeling work?

"A On remodeling, yes, sir.

"Q Why is that?

"A Because you don't always know what you're going to wind up with until you get things torn apart."

The manager for Judson's Plumbing & Heating, who eventually did the work, testified:

"Q Were you contacted by Mr. Ralph Allen in relation to submitting a bid on the plumbing of the Lumpkin-Taubman home?

"A I was.

"Q Approximately when was that, Mr. Elwood?

"A I don't remember exactly.

"Q Would you submit a bid on that project?

"A I did not submit one.

"Q Why did you not submit a bid?

"A After looking at the blueprints and the actual

[ 79 ]

building to be remodeled, there was [sic] so many places that I couldn't see to get a definite idea of what I needed to do."

Judson's subsequently agreed to do the work "on a time-and-material basis." Judson's also did the finishing work on the house for contractor Nordyke on the same basis, "time-and-materials." Other subcontractors testified in the same vein, explaining the refusal to give a firm bid for the reasons above expressed.

There is also evidence that 1974 was a year when certain building materials were not available and that prices were escalating. The contractor, under these circumstances, did his best to further the interests of the defendants. The evidence shows that there were numerous instances in which the plans and specifications could not be performed in a manner provided by the architect. As an example, the plans contemplated that the original structure had a base of pumice rather than concrete. The water closet installations were improperly designed. The plans called for the application of shakes over the existing shingles, but the building code did not permit this. Therefore, it was necessary to remove the old roof in small squares and replace it immediately with the required shakes to protect the existing hardwood floors. Also, the architect had not discovered a crack in the old fireplace, which caused a leak and required the removal of the original fireplace. It was also necessary to build an additional support and change the structure for the overhanging carport. The plans did not call for the building of an additional road for access to the turn-around by the house and this, with many other unrealized instances, increased the cost of construction.

Defendants also contend "[t]he court erred in finding that there was only one item included in the lien notice not chargeable under the contract."

Defendants argue that the plaintiff should not have added five percent to its labor and materials and to the

costs of subcontractors. In this connection, defendants' brief states:

"* * * Defendants would admit that this overcharge can be segregated on the face of the lien, and if found to be made in good faith and without culpable negligence, deducted without invalidating the lien."

However, paragraph 9.1.17 of the contract provides, "Cost to include contractors overhead operating expense of 5% materials and labor costs." The term "material and labor" is not defined in the contract.

Paragraph 7.1 provides, "In consideration of the performance of the Contract (including "changes in the work"), the Owner agrees to pay the Contractor in current funds as compensation for his services a Contractor's Fee as follows: 10 PER CENT OF THE COST OF THE WORK." Defendant Lumpkin testified that she read the contract and went over it paragraph by paragraph before she signed it.

Article 12.2 provides, in part, as follows:

"12.2 * * * Subcontracts awarded on the basis of the cost of such work plus a fee shall also be subject to the provisions of this Agreement insofar as applicable."

Plaintiff contends that the contract gives it the right to charge five percent of material and labor, including subcontract payments, as a part of its costs.

It is not our duty to rewrite the agreement between the parties, and the same could be reasonably interpreted to include the five percent charge for the builders' services involved in procuring and supervising subcontractors. There is evidence that considerable work was done in this respect. There is also evidence that the monthly billing statements forwarded by plaintiff to the bank and thence to the defendants were paid without protest, including the above charges. We conclude that this charge was properly made under the contract. For a similar situation involving a contract between an owner and contractor on a cost plus basis where the contract is

[ 81 ]

ambiguous, *see Mathis v. Thunderbird Village, Inc.,* 236 Or 425, 434, 389 P2d 343 (1964).

Next, the defendants contend "[t]he court erred in finding that the inclusion of the compressor for the heating system in the lien notice was in good faith and without culpable negligence." In this respect, the trial court found:

"* * * * *.

"7. The lien notice did not include items not chargeable under the contract except the compressor for the heating system. The inclusion of the compressor was in good faith without culpable negligence. The compressor can not be segregated by looking at the face of the lien. It can be segregated by segrating [sic] the whole of the separate Hendrix lien of $6,902.10 which specifically includes the compressor at $1,988. The entire items in Hendrix lien of $6,902.10 are segregated from the Plaintiff's lien."

The evidence shows that the original plans called for two heat pumps (compressors) to be installed for the heating system. Subsequently, it was discovered that this system could not be worked as there was not enough clearance to provide heat ducts to certain portions of the original structure. With the consent of the defendants, the plans were changed to provide for one heat pump and baseboard heating in portions of the original structure. This work was not complete when plaintiff ceased work on the project. In the meantime, the one heat pump had been ordered and, unbeknown to the plaintiff, the heat pump was in its warehouse at the time of trial. Plaintiff Allen did not discover that the heat pump had not been delivered until after noon recess on the first day of trial, when he consulted with the heating contractor. It is clear from the evidence that the inclusion of the compressor as an item in the lien was done in good faith and without culpable negligence. As stated by the trial court, it could be easily segregated "by looking at the face of the lien," and plaintiff's lien is reduced in the amount of $6,902.10 for this segregated item which covered the heating subcontractor, Hendrix.

[ 82 ]

This is not a case where there is any contention that there was any fraud or misrepresentation on the part of the plaintiff. All of the sums included in the lien were expended by the plaintiff in improving the defendants' property. The unforeseen circumstances confronted in remodeling a pre-existing building were not unusual.

The defendants still have their action pending against the plaintiff on the law side of the court. Both parties rely on *Pippy v. Winslow,* 62 Or 219, 125 P 298 (1914). In *Gabriel v. Corkum et al,* 183 Or 679, 196 P2d 437 (1948), this court relied upon *Pippy* for holding that Gabriel, the owners of property in a mechanic's lien foreclosure case, was estopped from claiming nonperformance of the contract for the purpose of invalidating the lien when there was no evidence that Gabriel or the architect objected to the manner in which the improvements were made until after the contractor ceased work on the project. The facts in this case are similar.

We conclude that the lien filed by the contractor is a valid and subsisting lien for the amount specified therein as adjusted by the trial court.

Affirmed.