Argued June 5, affirmed September 12, 1978

WALKER THE WEEPER, INC., *Appellant,*

*v.*

COMMERCIAL ENGINEERING CORP., *Respondent.*
(No. 74-1554-L-3, SC 25179)

COMMERCIAL ENGINEERING CORP., *Respondent,*

*v.*

WALKER et al, *Appellants.*
(No. 74-1162-E-3, SC 25177)

COMMERCIAL ENGINEERING CORP., *Respondent,*

*v.*

WALKER et al, *Appellants.*
(No. 74-1190-E-3, SC 25178)

584 P2d 268

William G. Purdy, Medford, argued the cause for appellants. With him on the briefs was Frohnmayer, Deatherage, Foster & Purdy, Medford.

Robert H. Grant, Medford, argued the cause for respondent. With him on the brief was Grant, Ferguson & Carter, Medford.

BRYSON, J.

## BRYSON, J.

Commercial Engineering Corp., hereinafter referred to as "Contractor," brought two suits against Walker the Weeper, Inc., hereinafter referred to as "Walker," to foreclose mechanics' liens[1] for building a mobile home park[2] and a pond[3] for Walker[4] on a separate parcel of land.[5]

Walker brought an action[6] against Contractor, in three counts, alleging negligence and breach of contract in the design and construction of the mobile home park. Contractor answered and counterclaimed, alleging negligence on the part of Walker, the balance due for the reasonable value of its labor and materials furnished Walker, and certain counterclaims.

The three cases were joined for trial sans jury. The trial court, on request of counsel, made and entered extensive findings of fact and conclusions of law. The court entered judgment in favor of Contractor in all three cases and Walker appeals.

Walker's six assignments of error contend that the trial court "erred in finding Contractor was entitled to

---

[1] Now called construction liens—Construction Lien Law, ORS 87.001 to 87.060 and 87.075 to 87.088, Oregon Laws 1975, ch 466, § 1.

[2] The suit to foreclose on the mobile home park is circuit court case number 74-1162-E-3, filed July 8, 1974.

[3] The suit to foreclose on the parcel for construction of the pond is circuit court case number 74-1190-E-3, filed July 11, 1974.

[4] Defendant Jay Walker is actually Jack T. Walker, II, son of defendants Jack Walker and Adra M. Walker. Jay Walker purchased the mobile home park improvements from defendant Walker the Weeper, Inc., in March, 1976, for $375,000 and has also purchased the separate parcel, which involves the pond lien, from Jack and Adra M. Walker.

[5] The other parties include Mr. and Mrs. Bolz, the fee owners of the land upon which the mobile home park was constructed. Walker has a 55-year lease of the land from Mr. and Mrs. Bolz with an option to purchase. Walker represented their interests at trial. Another defendant was C. P. Westwood, an engineer who prepared some plans for Contractor and whose interests were similar to Contractor's at trial. Walker's action against Westwood was dismissed. No appeal was taken from that order and Westwood is not a party to this appeal.

[6] The action by plaintiff Walker is circuit court case number 74-1554-L-3, filed August 30, 1974.

recover upon its suit to foreclose its mechanic's lien upon the mobile home park," "in finding Contractor was entitled to recover upon its suit to foreclose its mechanic's lien upon the farm pond," "in making its findings of facts," and "in making its conclusions of law."

We review Contractor's two foreclosure suits de novo and Walker's action at law on the record to determine if there is any competent evidence to support the trial court's judgment.

We have reviewed all 15 volumes of transcript and 140 exhibits. Although there are conflicts of testimony, the general facts leading up to the transactions and litigation here involved are as follows. Jay Walker, president of Walker, had been engaged in the business of selling mobile homes and recreational vehicles for a number of years and was interested in constructing a mobile home park. In 1971 Jay Walker discussed with Robert Sevcik, president of Contractor, the possibility of building a mobile home park but this plan did not materialize. In 1972 Walker arranged with Contractor to examine a bare land site adjoining the city of Phoenix, in southern Oregon, as a location for constructing a mobile home park. The site, containing 13 to 15 acres, was deemed suitable. Walker ordered a low-cost, family-type mobile home park with minimum size requirements for tenants with lower income and children. No such park was available in the vicinity. Walker and Contractor agreed that Contractor would design and build the park according to certain broad guidelines set by Walker; however, Walker did not request detailed plans nor did he ever tell Contractor to build the park according to any particular plans. The parties wanted to get started on the project and have governmental approval before October 1, 1972. Jay Walker testified on direct examination as follows:

"Q And what did he [Sevcik] tell you those drawings represented?

"A These drawings were representing what we thought we were going to build in the park, is what I thought.

"Q Did you present these to the county?

"A Mr. Sevcik and I presented them to the county.

"Q What was the purpose of doing that?

"A We had to get an approval from the county before we could proceed on the park.

"Q Okay. And you heard some testimony that you were—I think it was Mr. Sevcik testified that you were trying to do this before October 1, is that correct?

"A We wanted to get started, get the ground broken before October 1st.

"Q And there was a change of law or a change in the governing body or supervision at that time?

"A Yes.

"Q What was it, a new ordinance?

"A Well, there was going to be a new park ordinance."

On cross-examination he testified:

"A I received a commitment from the bank July 5th of '72 for $200,000.00 [subsequently raised to $310,000], and the plans were approved on 9/22 of '72 by Mr. Dieriex, and that would be the commitment that I had at the time that the park was started.

"Q All right, so having reviewed that, was it the bank's first commitment in July of '72 that prompted you to request Mr. Sevcik to secure plans to submit to the county for approval?

"* * * * *.

"A Yes, I believe that's correct."

These drawings were those expressly drafted to secure construction approval from the state, county, and local health authorities, and to enable Contractor to obtain bids and prices in order to submit an estimate of construction costs to Walker in obtaining his financing from the bank. For reasons hereinafter stated, the parties mutually deviated from these original drawings. In fact, the park was not built according to any particular plans.

[ 411 ]

Walker wanted the park constructed as inexpensively as possible. On May 3, 1972, Contractor wrote to Walker regarding the "Proposed construction of trailer park" stating, "[t]he following is an itemized breakdown of the *estimated* cost for the construction of the development" (emphasis added), setting forth some 12 itemized cost items totaling $250,877 with an alternate estimated price for carports with or without storage. The carports were eliminated by Walker.

On May 5, 1972, Walker wrote a letter to the United States National Bank of Oregon, based on estimated costs submitted in Contractor's letter of May 3. The letter to the bank for the purpose of securing financing used Contractor's estimated costs, stating that the development and construction was for "121 FAMILY UNITS." The letter further stated that "33% of the spaces will take double wides, and the balance will take 12' or 14' wides [referring to width of the mobile homes]."

When the project was approved by governmental authorities and construction was commenced, the boundaries of the project site had not been determined because of certain claims to a portion of the property on the easterly perimeter. When the preliminary plans were submitted to the financing bank, they required the moving of considerable ground to a higher level to improve the "floodplain" of the parcel on which the park was being constructed. It was discovered that the sewer line into which the park was to tie its sewage outlet was outside of a known sewer easement. The original drawings provided for roads with a crown in the middle and curbings. In an effort to reduce expenses, Walker eliminated certain curbings and the crown type roadways in favor of a "valley" roadway with drainage down the middle. Walker was to provide topsoil for the project, which was eliminated at his request. There is expert testimony that considerable topsoil was important to improve the drainage of the site.

In general, Walker left the building in Contractor's hands. Walker approved construction on the site from time to time. At first Walker was pleased with the low cost of the park. However, in November, 1973, as the project was nearing completion, Jackson County experienced one of the heaviest rainfalls in its history. The flooding that followed caused some drainage problems and some damage in the asphalt roadways in the park. This was the beginning of the troubles between the parties. Walker also became dissatisfied with the lot sizes, the shale pads for the mobile homes, and other lesser details. Contractor had billed Walker on time and material as the work progressed. Walker then ceased to make payments, as billed by Contractor, and Contractor ceased work, although the construction was substantially completed. At the time of trial the mobile home park spaces were almost all rented and the average monthly charge per space was between $65 and $67, which was in excess of the $60 estimated by Walker in his letter of May 5 to the bank.

On cross-examination Jay Walker testified:

"Q And the park as it was actually constructed and as operated by you has 121 spaces?

"A I believe that's correct.

"Q And yields an average rental of around $65.00 a space, does it not?

"A Yes.

"Q So that isn't it a fact, Mr. Walker, that the park that was actually produced for you here is substantially in accordance, so far as income is concerned, with the projections that you submitted to the bank?

"A In relationship to the manner in which I submitted it to the bank, yes."

I. *The Mobile Home Park Lien*—Circuit Court #74-1162-E-3

Contractor sought to foreclose its construction lien arising out of its work on Walker's mobile home park. No issue is raised on appeal as to the validity of the liens. Contractor alleged that the reasonable value of

[ 413 ]

the work performed and materials furnished was $251,198.08, of which Walker had paid $231,128.23, leaving a balance due of $20,069.85. Contractor prayed for a decree for the balance due, costs, attorney fees, and for foreclosure of the lien. Walker's answer alleged that the reasonable and agreed contract price for the services and materials was only $238,264.08. Walker further alleged that it was entitled to set off against any sum due to Contractor certain damages caused by Contractor's alleged failure to construct the park in a good and workmanlike manner or in accordance with the contract. Walker also alleged that it was entitled to $10,761.21 recoupment for damages suffered by Walker because of Contractor's improper performance of the work. Contractor denied these allegations.

Walker argues that its agreement with Contractor was an estimate with a guaranteed maximum. Jay Walker testified:

"THE COURT: Did I hear you correctly, Mr. Walker, that you built the park on a cost plus basis?

"THE WITNESS: Well, these were supposed to be guaranteed maximums, and if they cost less, I was to get credit for them, and basically we discussed very far back in the original that it was going to be cost plus 10, and I never followed through with it or anything because I didn't think it was that material at the time * * *."

We have found nothing in the testimony or exhibits to show that the parties ever agreed on a firm price. The exhibits cited in Walker's brief in support of its assertion that there was a fixed price plainly labels the cost as "estimated cost."

We conclude it is unnecessary to discuss each of Walker's attacks on the trial court's findings. In fact, it would be difficult to improve on the following portion of the trial court's findings, with which we agree:

"That plaintiff and defendant Walker The Weeper, Inc.'s agent, Jay Walker, mutually agreed that extensive plans for the construction of the mobile home site would

[ 414 ]

not be necessary. Defendant Jay Walker did have some experience in formal contracting and bidding.

"Defendant Jay Walker insisted on deliberate speed in the commencement of construction of the mobile home park in order to avoid anticipated changes in Oregon law regarding the construction and operation of mobile home parks.

"* * * * *.

"The parties did not agree upon a firm price for construction of the project. Defendant Walker The Weeper, Inc. requested services from plaintiff from time to time on a time and material basis with the estimate as a maximum unit price. The plaintiff performed services for defendant Walker The Weeper, Inc.'s benefit between October 2, 1972 and December 6, 1973.

"* * * * *.

"* * * The Court finds that the asphalt-concrete roads in defendants' mobile home park prematurely failed because of sub-base water saturation. The Court further finds that the lack of topsoil on lands adjoining the edge of the asphalt-concrete enabled surface waters to remain in place and percolate into the sub-base beneath the asphalt-concrete. The presence of properly placed and contoured topsoil would have carried surface waters onto the finished grade of the asphalt-concrete thereby allowing the water to flow into the valley gutter drain.

"* * * * *.

"The Court finds that Walker The Weeper, Inc. requested that 33% of the spaces in the mobile home park be constructed so that they would accommodate double-wide trailers. A double-wide trailer, at the time of construction herein, was either 20' or 24' wide. Defendant Walker The Weeper, Inc. requested that the balance of the sites be large enough to accommodate either 12' or 14' wide mobile homes.

"The Court further finds that plaintiff has filed and perfected a timely notice of lien herein and that the amount claimed thereon is for the reasonable value of labor performed and materials furnished.

"* * * * *.

"The Court finds that the total reasonable value of the labor performed and materials furnished on the real

property described in plaintiff's amended complaint on file herein is the sum of $251,198.08. That the defendant Walker The Weeper, Inc. paid to plaintiff the sum of $231,128.23. That there is a balance due and owing from defendant Walker The Weeper, Inc. to plaintiff in the sum of $20,069.85. That the judgment and lien herein is for the balance due and owing."

We agree with Walker's argument that a contractor who intentionally and substantially deviates from contract plans and specifications is not entitled to foreclose a mechanic's lien on the improvement built pursuant to the contract. *Shepherd v. Gass,* 260 Or 84, 87, 488 P2d 1180 (1971). Walker argues that there were such deviations in this case. There were deviations from drawings from time to time, necessitated by conditions and facts previously set forth, but these deviations, if such they were, were agreed to by Walker. However, we conclude that the parties never agreed that any specific drawing should control the construction. The parties had conferences and Walker inspected the work as it progressed. Although we review equity cases de novo, we give "considerable weight" to the findings of the trial court. *Almond v. Anderegg,* 276 Or 1041, 1043, 557 P2d 220 (1976). We find, as did the trial court, that Contractor properly performed his work and offered evidence of the reasonable value of the services performed and the materials furnished. The reasonable value of the work done and materials furnished by Contractor in building the mobile home park for Walker was $251,198.08. There is no dispute that Walker paid $231,128.23, leaving a net sum due by Walker of $20,069.85.

II.  *The Pond Lien*—Circuit Court #74-1190-E-3

In this suit Contractor sought to foreclose its construction lien on certain real property on which it built a pond at the request of Jay Walker. Fee title to the property was in Jack Walker and Adra M. Walker, which they had sold on contract to their son, Jay Walker. This is a separate piece of real property from that on which the mobile home park was constructed.

[ 416 ]

There was no written contract for the building of the pond. Contractor alleged:

"* * * * *.

"V

"From August 20, 1973, through December 18, 1973, plaintiff, at the request of defendants, furnished labor and material used and incorporated in said improvement for the betterment of the improvement and real property.

"VI

"The reasonable value of labor performed and material furnished by plaintiff used and incorporated in the construction of said improvement is the sum of $3,793.27.

"* * * * *."

Contractor prayed for a decree in the amount due together with costs, attorney fees, and for foreclosure of the lien. Walker's amended answer admitted that the work was performed at the request of defendant Jay Walker and that the sum demanded in the amount of $3,793.27 had not been paid. Walker's separate answer and defense alleged that Contractor failed to properly construct the pond in that materials and workmanship failed to comply with good practices of quality, due to certain water leakage and failure of supervision; that defendants have been damaged by reason thereof in the amount of $750. Mr. Gilbert, an employee of Contractor with 25 years' experience in excavating and grading work in the Jackson County area, testified regarding the construction of the pond on the Walker residence. He testified that he constructed the pond at the depths given him by Jay Walker; that he built two islands in the pond and installed a gate to hold the water. He offered further testimony as to the workmanlike manner in which the construction work was performed and that the sum of $3,793.27 was a reasonable charge for the services performed. Contractor offered evidence that the claimed $750 in damages was not caused by its negligence but by Walker's failure to follow instructions on filling the pond and his failure to follow

[ 417 ]

instructions on the level of water to be maintained in the pond during stormy weather.

The trial court found "[t]hat between August 20, 1973 and December 18, 1973 the plaintiff [Contractor] at the request of Jay Walker furnished labor and materials which were used and incorporated in an improvement on the real property described in plaintiff's complaint on file herein.

"That the reasonable value of labor performed and materials furnished by plaintiff in the construction of the improvement is the sum of $3,793.27" and concluded that a decree be entered in this amount together with costs, disbursements and attorney fees.

We have examined all of the evidence and agree with the trial court's findings. We further conclude that the testimony of Contractor is more credible and, accordingly, reach the same findings as did the trial court.

III. *Walker's Action for Damages*—Circuit Court #74-1554-L-3

In this separate law action Walker claimed damages in the amount of $95,821.79 for Contractor's improper building of the mobile home park. Contractor's answer denied the complaint and affirmatively alleged facts similar to those in its foreclosure suits and demanded recovery in the same amounts. The trial court made and entered the same findings of fact in this law action as those entered in Contractor's suit to foreclose on the mobile home park. Accordingly, the trial court concluded that Walker failed to prove its allegation of damages and entered judgment for Contractor. Contractor also recovered on some counterclaims.[7]

---

[7]Contractor counterclaims $4,625.36 for extra labor and materials furnished in building the mobile home park and $1,200 for a rebate from Bear Creek Valley Sanitary Authority that should have gone to Contractor but instead went to Walker. There was evidence to support these awards. Contractor's recovery on these counterclaims is the subject of Walker's fifth and sixth assignments of error.

On appeal, Walker contends the trial court erred in making its findings of fact and conclusions of law. Of course this part of the consolidated cases is an action at law and the above assignments of error amount to an argument that Walker was entitled to a verdict as a matter of law.

■■ This court will not reverse a trial court on a question of fact unless we "can affirmatively say there is no evidence to support" the findings. *Hendrix v. McKee,* 281 Or 123, 125-26, 575 P2d 134 (1978); Oregon Constitution, Art VII (Am), § 3; ORS 17.435. Further, the prevailing party is entitled to the benefit of all favorable inferences that might be drawn from the evidence. *Hendrix v. McKee,* supra at 126.

These two suits and this law action being tried together, we do not find it necessary to again review the evidence. It is true that there was conflicting evidence, but in this case the trial court was entitled to disbelieve Walker's evidence.

Having fully reviewed all of the evidence in these cases, the trial court is affirmed in all three cases, circuit court numbers 74-1162-E-3, 74-1190-E-3, and 74-1554-L-3.