Argued and submitted April 14, reversed and
remanded September 22, reconsideration denied October 23,
petition for review denied December 31, 1980 (290 Or 302)

# B & D INVESTMENT CORPORATION,
*Respondent,*

*v.*

# PETTICORD, et al,
*Appellants,*
(No. 77-6-414, CA 14774)

617 P2d 276

John M. Berman, Portland, argued the cause and filed the briefs for appellants. With him on the briefs was Spears, Lubersky, Campbell & Bledsoe, Portland.

Paul R. Meyer, Portland, and Elizabeth Yeats, Portland, argued the cause and filed the brief for respondent. With them on the brief was Kobin & Meyer, Portland.

Before Gillette, Presiding Judge, and Roberts and Campbell, Judges.

CAMPBELL, J.

## CAMPBELL, J.

Plaintiff B & D Investment Corporation (B & D) contracted in December 1976 with defendants James and Doris Petticord, husband and wife, to build a residence according to plans and specifications supplied by the Petticords and prepared by their architect, Donald Cloyd. Soon after B & D began construction, serious disagreements between the parties arose, and in April 1977, when the house was approximately 25 percent complete, the Petticords terminated B & D's right to continue work and took exclusive possession of the premises. B & D filed suit to recover the reasonable value of work performed prior to the alleged wrongful termination, and to foreclose a construction lien in that amount. Defendants[1] appeal from a trial court order entering judgment against the Petticords for $42,114.10 plus interest, costs, and a $15,000 attorney's fee, impressing the house with a construction lien, and ordering the lien foreclosed. We review de novo. *Ralph Allen, Inc. v. Lumpkin,* 279 Or 71, 566 P2d 872 (1977).

■ Defendants first argue that the trial court erred in denying their demurrer to plaintiff's complaint on the grounds that it failed to state facts sufficient to constitute a cause of suit. The pertinent portions of the complaint state:

"On or about December 27, 1976, defendants Petticord entered into a contract with claimant directing plaintiff to perform certain labor and furnish certain materials for the construction of a dwelling on said lot in accordance with certain plans and specifications represented by defendants Petticord to be sufficient and adequate for building.

"Thereafter, plaintiff furnished materials and labor from December 27, 1976, until on or about April 25, 1977, when defendants Petticord wrongfully terminated the contract, resulting in a rescission thereof on or about April 25, 1977. The reasonable value of claimant's labor, materials and equipment was and is the sum of $67,146.93.

[1] Also named as defendants are Pioneer National Title Insurance Company, First National Bank of Oregon, which loaned money to the Petticords for construction of the house, and Gates Bros. Concrete Enterprises, Inc., a concrete contractor. Gates Bros. is not a party to this appeal.

"Plaintiff has demanded payment of the aforesaid sum of $67,146.93, but defendants Petticord have failed and refused to pay said sum except for the sum of $19,936.96. Defendants Petticord now owe plaintiff the sum of $47,209.97, together with interest thereon at 6 percent per annum from April 25, 1977."

Defendants did not demur to the complaint until the close of the evidence. Therefore, the complaint is construed liberally in favor of the pleader. *Sinclair v. Barker,* 236 Or 599, 390 P2d 321 (1964).

■　　　Due to our resolution of this case, it is sufficient that we now conclude that the complaint alleged facts sufficient to state a cause of action in quantum meruit. *See Bastian v. Henderson,* 277 Or 539, 561 P2d 595 (1977). *Cf. Ward v. Town Tavern et al,* 191 Or 1, 35, 228 P2d 216 (1951).

　　　We turn next to defendants' contention that the trial court erred in finding that B & D did not breach or anticipatorily repudiate the contract. Defendants first argue that B & D is not entitled to enforce a lien because it had not substantially performed its contractual duties as of April 25, 1977, the date of termination. Among the failures by B & D pointed to by the Petticords is that the construction was contrary in material respects to the plans and specifications.

■　　　When a contractor makes intentional and substantial deviations from the contract plans and specifications without the owner's consent, he is not entitled to foreclose a construction lien. *Walker the Weeper v. Commercial Eng. Corp.,* 283 Or 407, 584 P2d 268 (1978); *Shepherd v. Gass,* 260 Or 84, 488 P2d 1180 (1971); *Culver v. Rendahl et ux,* 211 Or 682, 318 P2d 275 (1957); *Birkemeier v. Knobel,* 149 Or 292, 40 P2d 694 (1935); *Pippy v. Winslow,* 62 Or 219, 125 P 298 (1912). B & D does not disagree that in building the house it deviated substantially from the plans and specifications. Plaintiff contends, however, that the changes were necessitated by defects in the plans and specifications, and were authorized by Cloyd, who acted as the Petticords' agent. In its memorandum opinion, the trial court stated:

"The plans, specifications and cost estimate material submitted by Mr. Cloyd to the plaintiff were inaccurate and erroneous to the extent that major modifications of the location of the home on the lot was necessary, resulting in a major change in the foundation and cement work with a major increase in costs. Mr. Cloyd, together with plaintiff, examined this problem and orally agreed upon going ahead with construction with alterations of the specifications and plot plan to correct the errors in design. Written change order signed by the Pettycords [sic] was not required since Mr. Cloyd was acting as supervisor and agent for them, and the changes were of such magnitude that Cloyd's action constituted a waiver of such written change order."

After reviewing the 1200-page transcript and approximately 100 exhibits, we agree that the plans and specifications were inaccurate in major respects, including (1) incorrect depiction of the location of a tree which was one of the crucial reference points in determining the placement of the house, and (2) an inaccurate topographical map, showing the land less steep in the planned location of the house than it actually is, and showing the contour lines of the land running roughly parallel to the long axis of the house at its proposed location rather than at a significant angle. We also find that as a result of these defects in the plans and specifications it was necessary to alter the placement of the house on the lot and to make major changes in the design of the foundation and retaining wall, all of which caused a substantial increase in the cost of the construction over that originally contemplated.

The contract, which was a standard form building contract prepared by defendants' attorney, provided that "All of said work is to be done under the supervision of owner who, for brevity hereinafter is designated as 'supervisor.'" (In a previous proposed contract on an identical form, prepared by Donald Giddings, president of B & D, Giddings had designated himself as "supervisor.") Article V of the contract provided:

"No eliminations or alterations shall be made in the work except upon written order of the supervisor. Should any such eliminations or alterations require new plans or specifications, the owner shall supply the same at his expense. Should any of said eliminations or alterations require an adjustment of the agreed price (upward or downward) such adjustment shall be evidenced by the written agreement of the parties. Should they not be able so to agree, the work shall go on nevertheless under the order mentioned above and the determination of the proper adjustment shall be referred to arbitration as hereinafter provided."

A provision appearing on the face of the plans, and thereby becoming incorporated in the contract, stated, "Contractor to check and verify all dimensions and all conditions at job site prior to start of work, and be responsible for same." Giddings testified on cross-examination that in the construction industry that provision means that if the contractor finds a variance between the conditions at the job site and those shown in the plans he is to obtain a change order or alternate plans, with an adjustment to the contract price.

Giddings admits that prior to changing the location of the house he did not call the errors in the plans to the Petticords' attention or request a written change order as required by the written contract. Instead, he informed Cloyd of the errors and Cloyd, who was frequently on the job site, agreed to the changes as necessary. Plaintiff contends, and the trial court found, that Cloyd was authorized as the Petticords' agent to make these changes, and that the contract's requirement of written change orders approved by the Petticords was waived.

The evidence shows that the Petticords never told Giddings that Cloyd had authority to make changes in the plans and specifications without the Petticords' prior approval. Nor did the Petticords give Cloyd that authority. Cloyd testified that under his agreement with the Petticords he was to visit the job site periodically to "verify the progress of the job" and

to tell the Petticords if the house "was lacking any architectural detail, et cetera."

Giddings testified as follows:

"Q ·* * * If you wanted an increase in the contract price, you would go to the Petticords themselves, wouldn't you?

"A    Per the contract, that's correct.

"Q    And that was your understanding, too, wasn't it?

"A    That was my understanding.

"Q    And the Petticords were to have final decisions on all changes, weren't they?

"A    Per the contract, that's correct.

"Q    And that was your understanding the way it was supposed to work, wasn't it?

"A    It was my understanding that either the Petticords or their representatives would be informed of need of changes.

"Q    And the Petticords personally were to have final decision, weren't they?

"A    Yes."

James Petticord testified that at a December 19, 1976, meeting at which Giddings, the Petticords, and Cloyd were present and during which the house plans and contract terms were agreed to, he asked Giddings "to keep us advised as to the progress or any problems or situations that developed on the job." Cloyd testified that at that meeting he had a conversation with Giddings concerning responsibility for potential cost overruns on the retaining wall. At that time the retaining wall was to be an "allowance" item under the contract, that is, an item with a cost assigned to it, any overrun to be charged to the owner. During the conversation it was agreed, according to Cloyd's testimony, that Giddings was to provide the Petticords with the exact height and cost of the retaining wall before construction, and that in event of his failure to do so the Petticords would not be charged with any additional cost over the allowance.

The evidence relied on by B & D to prove Cloyd's authority to make changes in the plans and

specifications without the Petticords' prior consent is unpersuasive. First, B & D cites Giddings' testimony that in November 1976, Doris Petticord told him to contact Don Cloyd "if there were any questions on the construction of the house." At that time, Giddings had just received a copy of Cloyd's plans for the proposed residence and was asked to submit a bid. The quoted statement is an excerpt from Giddings' testimony:

> " * * * Mrs. Petticord had indicated that if there were any questions on the construction of the house, *any of the details that would aid in my preparing my costing,* that I should contact Mr. Cloyd and Mr. Cloyd agreed while he was sitting at the table that that met with his approval." (emphasis added)

Thus, this testimony merely concerns the bidding process and is not evidence of Cloyd's authority to change the plans agreed to under the contract without the Petticords' prior consent.

B & D also notes that Doris Petticord, who was present on the job almost daily, never contradicted any of Cloyd's directives. The evidence fails to show, however, that Doris Petticord, who was inexperienced in construction practices, was ever aware that any of Cloyd's directives she may have overheard altered the plans for the house. The evidence further shows that Cloyd did not advise the Petticords of the change in the placement of the house or the resulting differences in the foundation walls and retaining wall.

■     The party asserting agency has the burden of proving the existence and extent of the principal-agent relationship. *Start v. Shell Oil Co. and Arntson,* 202 Or 99, 260 P2d 468, 273 P2d 225 (1954); *Jones v. Marshall-Wells Co.,* 104 Or 388, 208 P 768 (1922). There is no evidence that Cloyd had actual or implied authority to change the plans and specifications without the Petticords' consent. B & D may not rely on Cloyd's apparent authority to make the changes:

> "When * * * it appears that a person dealing with an agent knew that approval by another person was required or knew of other facts which would put him on inquiry as to the scope of the agent's authority,

* * * there can be no claim of apparent authority." *Hansen v. Power,* 279 Or 589, 592, 569 P2d 573 (1977).

*See Start v. Shell Oil Co. and Arntson, supra.* B & D, having admitted through its president Don Giddings that it was aware that the Petticords were to have final decision on all changes, cannot now claim that Cloyd had apparent authority to approve the changes.

Plaintiff also argues that the requirement of written change orders was waived. Although such a condition may be waived, *Hoskins v. Powder Land & Irr. Co.,* 90 Or 217, 176 P 124 (1918), B & D has not proven any waiver by the Petticords.

■ Plaintiff, citing *Ralph Allen, Inc. v. Lumpkin,* 279 Or 71, 566 P2d 872 (1977), argues that the Petticords, not having objected to the manner of construction prior to the time they terminated B & D, are estopped from claiming a lack of substantial performance and invalidating the lien. In *Lumpkin,* the court relied for its holding on *Gabriel v. Corkum et al,* 183 Or 679, 196 P2d 437 (1948), which in turn had relied on *Pippy v. Winslow, supra.* In *Pippy v. Winslow,* a suit to foreclose a mechanic's lien, the court noted that Winslow, the owner, was an experienced contractor who "practically superintended the construction for some time," and held that under those circumstances any objection should have been exercised promptly. Similarly, the owner in *Gabriel v. Corkum et al* was on the job nearly all the time and had been designated by the architect as the agent to supervise construction of the building. The owner's failure to object to the construction was held to estop him from claiming that the construction did not follow the plans and specifications.

In the present case, the Petticords were not aware that the foundation wall heights were built higher than called for in the plans and specifications until sometime during the framing stage of construction, when Doris Petticord "could see that the children couldn't go out of the game room and be on the ground level," as they could have had the house been built as

originally designed. The Petticords did not learn that the house was not built at the proposed location until after they moved into it. B & D bypassed the written change order procedure provided for in the contract, and intentionally built the house in a manner materially different from that set out in the plans. The evidence does not indicate that B & D, which had full knowledge of the facts, changed its position in reliance upon the Petticords' failure to object. In these circumstances, therefore, the Petticords are not estopped from asserting their rights. *See generally Bash v. Fir Grove Cemeteries, Co.,* 282 Or 677, 581 P2d 75 (1978); *Shelter Properties Inc. v. Moe,* 42 Or App 601, 600 P2d 969, *rev den* (1979).

■ We conclude that the trial court erred in impressing the Petticords' house with a lien and ordering the lien foreclosed.

Having disallowed the lien we next address the question: should this court proceed to determine the reasonable value of the materials furnished and services performed by the plaintiff, or should the case be remanded to the trial court as an action at law for that determination?[2]

ORS 87.060 in part provides:

[2] *Ward v. Town Tavern et al,* 191 Or 1, 228 P2d 216 (1951), was decided prior to the enactment of the portions of ORS 87.060 set out in the text of this opinion. In the *Ward* case, defendant Town Tavern appealed from a decree which sustained the plaintiff's lien and ordered its foreclosure. The Supreme Court found that the work and materials on trade fixtures were nonlienable and that the lien must fail because it did not segregate lienable and nonlienable items. The court was then faced with the problem of whether or not the case should be remanded for trial as a law action. It was decided that under the facts of the case the defendant had affirmatively requested the jurisdiction of a court of equity and, therefore, the case was not remanded to be tried as a law case. The Supreme Court decided the amount in controversy. However, the court said the following at page 35:

"* * * If the sum for which judgment is sought is free from dispute, judgment for that amount may be entered even though the plaintiff fails to prove his lien or the court holds it invalid. If the value of the labor or materials was in controversy but the defendant waived trial by jury, the court may enter judgment for the proper amount. If trial by jury was not waived and the value of the labor or materials was controverted, the cause should be transferred to the law side of the court."

"(2)   * * * If the lien is allowed, the court shall proceed with the foreclosure of the lien and resolve all other pleaded issues. If the lien is disallowed, and a party has made a demand for a jury trial as provided for in subsection (3) of this section, the court shall empanel a jury to decide any issues triable of right by a jury. All other issues in the suit shall be tried by the court.

"(3)   A party may demand a trial by jury of any issue triable of right by a jury after the lien is disallowed, if that party serves a demand therefor in writing upon the other parties at any time prior to commencement of the trial to foreclose the lien. The demand shall be filed with the court. The failure of a party to serve a demand as required by this rule shall constitute a waiver by him of trial by jury. * * * "

The record in this case does not contain a demand for a jury trial filed by either party. Failure to serve the demand constitutes the waiver of a trial by jury but does not constitute a waiver of the parties' right to have the law action tried by the trial court sitting as the trier of fact without a jury.

We therefore reverse the trial court's judgment and decree and remand to the trial court to determine the reasonable value, if any, of the materials furnished and services rendered by the plaintiff to the defendants Petticord. *Welch v. Webb,* 47 Or App 771, 615 P2d 391 (1980); *Betz v. Peterson,* 47 Or App 333, 614 P2d 1184 (1980).[3]

Reversed and remanded.

---

In our case there was no affirmative request for a court of equity to retain jurisdiction.

In both our case and the *Ward* case the amount claimed to be due the plaintiff was in dispute. The *Ward* case, like ORS 87.060 (2) and (3), fails to distinguish between the "waiver of a jury trial" and the "waiver of a law action where the court sits as the sole trier of fact." We are of the opinion that the waiver of the former does not include a waiver of the latter for the reasons expressed in the text of the opinion.

[3] Because of our resolution of the case, it is not necessary for this court to address the remaining issues raised.